AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>PETER EDWARD MARIN,<br><br>*Defendant(s)* | Case No.<br>25-MJ-6267-VALLE |

FILED BY _____ D.C.
APR 3 0 2025
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of **February, 2025 through April 28, 2025,** in the county of **Broward** in the **Southern** District of **Florida**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Sections 841(a)(1) and (b)(1)(A) | Possession with Intent to Distribute a Controlled Substance (Methamphetamine) |

This criminal complaint is based on these facts:
See attached Affidavit.

☑ Continued on the attached sheet.

_____ 17678
Complainant's signature

Daniel Rengifo, DEA TFO
Printed name and title

Sworn to and subscribed before me in chambers.

Date: 4/30/25

_____
Judge's signature

City and state: Fort Lauderdale, Florida

Alicia O. Valle, United States Magistrate Judge
Printed name and title

## AFFIDAVIT

I, Daniel Rengifo, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. This affidavit is being submitted in support of a criminal complaint which charges Peter Edward MARIN with Possession with Intent to Distribute a Controlled Substance (methamphetamine), in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A).

2. I am a Task Force Officer (TFO) with the Drug Enforcement Administration ("DEA") and have served in this capacity since October of 2023. Currently, I am assigned to Enforcement Group 6 in the Miami Field Division. I am also a Detective for the Broward County Drug Task Force working for the Broward Sheriff's Office and have served such a capacity since September 2022. As a member of the Broward County Drug Task Force, I have worked on numerous narcotic related investigations, some in an undercover capacity.

3. On the investigations I participated in, multi-kilogram seizures have occurred. During my undercover career, I have been able to initiate criminal investigations that have led to seizures of large quantities of currency, vehicles, narcotics, and firearms. I have also worked in an undercover capacity where I primarily spoke in Spanish to facilitate the undercover role I was portraying.

4. I have received formal schooling in narcotics related investigations including, but not limited to, successful completion of the Narcotics and Dangerous Drugs 40-hour course, several undercover classes offered by HIDTA (Undercover Operations, Drug Conspiracy Investigations, Drug Parcel Interdiction and Delivery). I have also taken the 40-hour DEA basic investigators course, which included a section involving undercover operations.

5.  I have written and participated in numerous narcotics search warrants. I have worked with several federal entities including the Federal Bureau of Investigation, Drug Enforcement Administration, Homeland Security Investigations, Customs and Border Patrol, and the Bureau of Alcohol, Tobacco, Firearms and Explosives. My investigations have resulted in individuals being apprehended and later sentenced to prison terms.

6.  As such, I am a law enforcement officer of the United States, within the meaning of Title 18, United States Code, Section 2510(7), who is empowered to conduct criminal investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

7.  I submit this Affidavit based on information known to me personally from the investigation, as well as information obtained from others who have investigated the matter or have personal knowledge of the facts herein. Because this Affidavit is being submitted for the limited purpose of establishing probable cause for the requested warrant, it does not include every fact known to me about this matter.

**Probable Cause: Background**

8.  During February 2025, a BSO confidential source (herein identified as the CS) contacted BSO Detective H. Castro and advised that a methamphetamine Drug Trafficking Organization (DTO) was looking for a buyer in South Florida to sell fifty (50) kilograms of methamphetamine. The CS, under law enforcement direction, was instructed to arrange a phone call between the drug traffickers and Detective Castro (acting in an undercover capacity "UC") to further the investigation.

9.  On Saturday, February 23rd, 2025, Detective Castro received a FaceTime group call from the CS and members of the DTO. The members of the DTO were later identified as K.J.

and Peter Edward MARIN (hereinafter "MARIN"). During the FaceTime phone call, Detective Castro was able to determine K.J. was using phone number +1 (470) 471-7196, while MARIN was using phone number +1 (256) 348-9626. During the FaceTime phone call, the CS introduced Detective Castro as a potential drug trafficker from south Florida. While the FaceTime call was occurring, Detective Castro was only able to see MARIN's face. The members of the DTO discussed selling fifty (50) kilograms of crystal methamphetamine to Detective Castro, but did not provide a total price at the time.

10. MARIN advised that he was currently holding ten (10) kilograms of methamphetamine, which he offered to sell to Detective Castro for $3,500 each if Detective Castro was willing to travel to Atlanta, Georgia to pick them up. Detective Castro informed MARIN, due to logistical issues, Detective Castro was unable to travel to Atlanta now. Detective Castro told MARIN they would discuss conducting the methamphetamine drug deal at a later time.

11. On Monday, February 24th, 2025, Detective Castro made a recorded phone call to MARIN via phone number +1 (256) 348-9626. During the conversation, they discussed the logistics of the drug transaction. Detective Castro asked MARIN if MARIN could send one (1) kilogram of crystal methamphetamine. MARIN said he would be able to send one (1) kilogram of methamphetamine via the mail in exchange for $5,000.00. MARIN told Detective Castro that he could send the money digitally to MARIN's Zelle or CashApp.

12. In the following days, Detective Castro provided the CS with a BSO confidential address that the CS could forward to the DTO.

13. On Tuesday, March 18th, 2025, the CS was provided a FedEx receipt for an overnight delivery to the name and address that Detective Castro had provided. The receipt was

sent to the CS by K.J.

14. On Thursday, March 20th, 2025, Detective Castro retrieved the parcel from a BSO undercover mail location and transported it to a BSO secure evidence locker.

15. On Friday, March 21st, 2025, DEA TFO Det. Rengifo and Detective Castro opened the box and retrieved approximately 2.05 kilograms of suspect crystal methamphetamine, which were contained within a sealed metal cannister. DEA TFO Det. Rengifo removed a small sample of methamphetamine for testing purposes. The sample was placed inside of a DEA-issued methamphetamine test kit, which yielded positive results for the presence of methamphetamine.

16. After receiving the parcel, which contained the methamphetamine, Detective Castro placed a FaceTime call to MARIN. Detective Castro told MARIN he was happy with the quality of the methamphetamine. MARIN immediately asked Detective Castro if Detective Castro realized MARIN had sent two (2) kilograms of methamphetamine instead of one (1) kilogram of methamphetamine.

17. MARIN told Detective Castro that MARIN didn't feel like opening the cannister to remove one (1) kilogram of methamphetamine. MARIN stated he sent the cannister to Detective Castro exactly in the manner he had received it, meaning each cannister already contained two (2) kilograms of methamphetamine. Detective Castro told MARIN that Detective Castro would send MARIN the $5,000 for only one (1) kilogram, and would pay the remaining balance when they completed the bigger transaction for either 20 kilograms or 50 kilograms of crystal methamphetamine.

18. Detective Castro asked MARIN to provide an account to send the $5,000. MARIN told Detective Castro to send the money to MARIN's cell phone via Zelle, and to his

4

Cashapp using the name "$crypls". During the same conversation, Detective Castro told MARIN that Detective Castro had access to large quantities of cocaine, if MARIN would be interested in exchanging products.

19. A few hours later, Detective Castro received a phone call from MARIN. During the conversation, MARIN told Detective Castro to hold on to the payment for the second kilogram of methamphetamine due to MARIN being interested in exchanging his methamphetamine for Detective Castro's cocaine. MARIN also stated he would pay the difference.

20. Later that day at approximately 1520 hrs., Sergeant J. Augustus utilized an undercover BSO Zelle account to make an initial payment for the narcotics transaction. $2,000 of DEA Official Investigative Funds were transferred to MARIN's Zelle account using the phone number MARIN provided (256 348 9626).

21. On Monday, March 24th, 2025, at approximately 0935 hrs., Sergeant Augustus utilized an undercover BSO Zelle account to make a secondary payment for the narcotics transaction. $2,000 of DEA Official Investigative Funds were transferred to MARIN's Zelle account using the phone number MARIN provided (256 348 9626).

22. On Wednesday, March 26th, 2025, at approximately 1111 hrs., Sergeant Augustus utilized an undercover BSO Cashapp account to settle the remaining balance for the narcotics transaction by sending $1,000.00 of DEA Official Investigative Funds to MARIN's Cashapp account using CashApp name "$crypls".

Continued Probable Cause:

23. On April 25, 2025, at approximately 1215 hours, Detective Castro received a text message from MARIN advising that MARIN was planning on travelling to South Florida on

either Sunday (04/27/25) or Monday (04/28/25) to sell Detective Castro ten (10) kilograms of methamphetamine. Detective Castro agreed to the drug deal and advised he would await his arrival.

24. On April 28, 2025, Detective Castro received a text message from MARIN advising he was running a little behind but would be arriving around 2000 hours. Detective Castro later spoke with MARIN, who stated he was driving down and was planning on staying close to the Fort Lauderdale airport. Detective Castro told MARIN he would provide MARIN with a hotel close to the airport, where they could meet to facilitate/complete the drug deal. While they continued to talk, MARIN told Detective Castro that the methamphetamine was stored in the same style cannisters as the previous cannisters he sent via the mail.

25. Once it was determined MARIN was travelling via vehicle and would be flying back to Atlanta, Georgia the following day, DEA TFO Det. Rengifo was able to locate the car rental company MARIN used to rent a red Dodge Ram 1500 bearing FL tag#QZUN83. DEA TFO Det. Rengifo was then able to track the listed vehicle as the vehicle travelled south on the Florida Turnpike toward Broward County.

26. Members of law enforcement, including the DEA and BSO, briefed at a pre-determined location and discussed the operation which would occur. Detective Castro provided MARIN with an address advantageous for law enforcement, to meet MARIN to complete the methamphetamine drug deal.

27. MARIN agreed to meet at this location and advised he would be arriving within an hour. DEA and BSO were able to establish surveillance around the provided address awaiting MARIN's arrival. Detective Castro also arrived at the predetermined deal location driving a BSO confidential vehicle. Detective Castro was also provided with covert audio/video equipment, which allowed law enforcement to monitor the transaction as it transpired.

28. At approximately 1940 hours, MARIN arrived at the provided address driving the red

Dodge Ram as a sole occupant. MARIN parked along the passenger side of Detective Castro's confidential vehicle. Detective Castro and MARIN then met with each other in the parking lot where MARIN handed over a FedEx box to Detective Castro, which MARIN had stored in the back seat of the Dodge Ram he was driving.

29. Detective Castro took possession of the FedEx box and placed it in the hatch of the confidential vehicle. Detective Castro then opened the FedEx box and removed one (1) of the metal cannisters. Both Detective Castro and MARIN entered the confidential vehicle to allow Detective Castro to inspect the quality of the methamphetamine. Once Detective Castro opened the cannister and inspected the methamphetamine, Detective Castro provided the take down signal and MARIN was apprehended without incident.

30. Once MARIN was in custody, MARIN requested an attorney. Inside of the FedEx box, law enforcement officers located a total of five (5) cannisters, to include the one (1) cannister Detective Castro had opened. The cannisters were opened and a total approximate weight of 10.04 kilograms of suspected methamphetamine were found. DEA TFO Rengifo removed a small sample of the suspected methamphetamine from one of the cannisters and used a BSO issued methamphetamine field test kit, which yielded positive results for the presence of methamphetamine.

[SPACE INTENTIONALLY LEFT BLANK]

31.     Based on the aforementioned facts, I respectfully submit that there is probable cause to support the arrest of Peter Edward MARIN for Possession With Intent to Distribute a Controlled Substance (methamphetamine), in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A).

**FURTHER YOUR AFFIANT SAITH NAUGHT.**

_____
DANIEL RENGIFO, TASK FORCE OFFICER
DRUG ENFORCEMENT ADMINISTRATION

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 in Chambers on this 29th day of April, 2025.

_____
HONORABLE ALICIA O. VALLE
UNITED STATES MAGISTRATE JUDGE

8